1

2

3

4

5

6

7                          IN THE UNITED STATES DISTRICT COURT

8                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   CHRISTOPHER YANKE,                          No. C-08-04379 EDL

11             Plaintiff,                         **ORDER STAYING CASE AS TO CITY
                                                  DEFENDANTS AND GRANTING
12      v.                                        DEFENDANT RAFFLE'S MOTION TO
                                                  DISMISS**
13   CITY OF OAKLAND, et al.,

14             Defendants.

15   _____/

16          This action arises out of Plaintiff Christopher Yanke's employment as a police officer with

17   the City of Oakland.  Before the Court are Motions to Dismiss by Defendants City of Oakland,

18   Debra Taylor Johnson, Kenneth Parris and Wayne Tucker's ("the City Defendants") and by

19   Defendant Dr. Stephen Raffle.  The City Defendants argue that the Court should dismiss this case

20   pending resolution of the parallel state case or, alternatively, that the case should be dismissed for

21   failure to state a claim against them.  Defendant Raffle joins in the City's request for a dismissal

22   based on the pending state case and argues that Plaintiff has failed to state a claim against him.

23          On June 24, 2009, the Court held a hearing on Defendants' motions.  On June 29, 2009, the

24   parties filed additional briefing regarding several issues that were raised at the hearing.  For the

25   reasons stated at the hearing and below, the Court issues the following Order.

26   **Relevant Facts**

27          Plaintiff has been employed as an Oakland police officer since 1992.  3d Am. Compl. ¶ 16.

28   During his tenure, he has complained that he has been blacklisted and that  he suffered retaliation for

     providing testimony regarding a partner's use of excessive force.  3d Am. Compl. ¶ 17.  In 2000, the

**United States District Court**
**For the Northern District of California**

United States District Court
For the Northern District of California

1   Oakland Police Department investigated Plaintiff for an alleged one hour discrepancy on his time

2   card, and Plaintiff was given a five day suspension.  3d Am. Compl. ¶¶ 19, 21.  After being

3   transferred to the helicopter unit in 2000, Plaintiff attempted to address the "snitch" label that fellow

4   officers had attributed to him.  3d Am. Compl. ¶ 18.  In 2001, Plaintiff requested a meeting with his

5   chain of command to address the "snitch" issue.  3d Am. Compl. ¶ 22.  In June 2003, Lieutenant Yee

6   stated at an officer's retirement luncheon that Plaintiff's father was the "only Sergeant Yanke we

7   will ever have at OPD."  3d Am. Compl. ¶ 23.

8       Several months later, Plaintiff was required to undergo a fitness-for-duty examination.  3d

9   Am. Compl. ¶ 24.  Plaintiff was deemed fit for duty by the City's medical doctor and psychiatrist,

10  Defendant Raffle.  3d Am. Compl. ¶ 24.  In January 2004, Plaintiff was taken off work by his doctor

11  due to stress.  3d Am. Compl. ¶ 25.  On March 29, 2005, Plaintiff was cleared by his doctor, Dr.

12  Berg, for light duty.  3d Am. Compl. ¶ 26.  On April 21, 2005, Dr. Raffle issued a report based on

13  Dr. Berg's letter clearing Plaintiff for light duty.  3d Am. Compl. ¶ 27.  On May 17, 2005, Dr. Raffle

14  issued a second supplemental report stating that Plaintiff was "temporarily not fit for duty for any

15  type of patrol car, on a motorcycle or walking a beat."  3d Am. Compl. ¶ 28.

16      On June 27, 2005, Plaintiff was assigned to the police department's Technology Unit.  3d

17  Am. Compl. ¶ 30.  On December 5, 2005, Plaintiff received an annual performance evaluation which

18  stated that he exceeded expectations in the Technology Unit.  3d Am. Compl. ¶ 32.

19      On February 15, 2006, Tiffany Webb, from the Oakland Police Department medical

20  department, wrote to Plaintiff's supervisor stating that Plaintiff's work accommodation in the

21  Technology Unit ended that week, and that he must provide a verification from his treating

22  physician to remain in the accommodated position.  3d Am. Compl. ¶ 33.  On February 16, 2006,

23  and in July 2006, Dr. Berg wrote letters confirming that Plaintiff should remain in the Technology

24  Unit as an accommodation.  3d Am. Compl. ¶¶ 34, 36.  Plaintiff alleges that while his assignment to

25  the Technology Unit was temporary, he believed that there were full-time job assignments open in

26  that Unit and that when he was removed from the Unit, other employees were placed there to do the

27  work that he was doing.  3d Am. Compl. ¶ 35.

28      On April 6, 2006, Plaintiff filed an investigation request with the Internal Affairs Section,

1  complaining about false statements made by other officers. 3d Am. Compl. ¶ 38. On June 21, 2006,

2  Plaintiff sent an email to police department officials, including the individual Defendants here, as

3  well as the monitors of the Riders Settlement Agreement that was reached in a separate litigation,

4  informing them that the Internal Affairs Policy regarding the timeliness of investigating claims had

5  been violated with respect to his April 6, 2006 investigation request. 3d Am. Compl. ¶¶ 39-40.

6       Following that email, on June 23, 2006, Plaintiff was ordered to another interview with

7  Internal Affairs. 3d Am. Compl. ¶ 42. Plaintiff alleges that the Internal Affairs officers asked him

8  questions that were not germane to his Internal Affairs complaint. Id. On October 21, 2006,

9  Oakland police department administratively closed his Internal Affairs complaint. 3d Am. Compl. ¶

10  49.

11       Meanwhile, on August 11, 2006, Ms. Webb sent Plaintiff an email seeking verification from

12  Plaintiff's doctor that Plaintiff still required accommodation in the Technology Unit. 3d Am.

13  Compl. ¶ 44. Dr. Berg replied by letter of August 19, 2006 stating that Plaintiff was still in need of

14  the Technology Unit accommodation. 3d Am. Compl. ¶ 45. In September 2006, Plaintiff's

15  accommodation in the Technology Unit was extended by six months. 3d Am. Compl. ¶ 47.

16       In October 2006, Plaintiff alleges that an arbitration decision relating to his transfer from the

17  Helicopter Unit was issued. 3d Am. Compl. ¶ 48. Plaintiff received back pay based on the lack of a

18  due process hearing regarding his transfer from the Helicopter Unit. 3d Am. Compl. ¶ 48.

19       On November 2, 2006, Plaintiff was ordered to another fitness for duty examination with Dr.

20  Raffle. 3d Am. Compl. ¶ 50. Plaintiff alleges that this fitness for duty examination was neither job

21  related nor consistent with business necessity. 3d Am. Compl. ¶ 52. Plaintiff contends that the only

22  rationale for the fitness for duty evaluation was an after-the-fact email stating that because Plaintiff

23  had been on light duty for over one year, the department needed to evaluate his ability to function as

24  a police officer. 3d Am. Compl. ¶ 70.

25       Plaintiff alleges that when he appeared for the examination, he was required to sign a release

26  allowing Dr. Raffle to discuss all of the details of the examination, not just whether Plaintiff was fit

27  for duty. 3d Am. Compl. ¶ 54. On November 10, 2006, Dr. Raffle performed a psychiatric fitness-

28  for-duty examination, including administration of the MMPI-2 true/false test consisting of 600

**United States District Court**
For the Northern District of California

1   questions.  3d Am. Compl. ¶ 55.  According to Dr. Raffle, Plaintiff did not complete thirty questions

2   on the MMPI.  3d Am. Compl. ¶ 56.  Dr. Raffle was unable to score the test because a leading

3   authority in MMPI-2 interpretation considers a profile invalid when thirty or more questions are

4   unanswered, and because Dr. Raffle thought that Plaintiff had something to hide.  3d Am. Compl. ¶¶

5   56-58.  Dr. Raffle found Plaintiff unfit for duty.  3d Am. Compl. ¶ 63.  Plaintiff was directed to turn

6   in his gun and badge until he could be found fit for duty.  3d Am. Compl. ¶ 71.  Plaintiff alleges that

7   he was always ready to complete the test, but was not allowed to do so.  3d Am. Compl. ¶ 64.

8        On December 1, 2006, Plaintiff alleges that he was removed from his full-time position in

9   the Technology Unit without a due process hearing, even though his November 2006 performance

10  review stated that he exceeded expectations and was fully effective in his job.  3d Am. Compl. ¶¶

11  65-66, 69.  On December 19, 2006, the City returned Plaintiff's badge and gun and confirmed that

12  he was still a police officer.  3d Am. Compl. ¶ 72.

13       In February 2007, Plaintiff was offered a civilian job as a latent print examiner, which he

14  apparently refused.  3d Am. Compl. ¶ 73.  On June 15, 2007, Plaintiff's pay was reduced to zero.  3d

15  Am. Compl. ¶ 74.  On July 3, 2007, Plaintiff was placed on sick leave without pay indefinitely and

16  retroactively to April 1, 2007.  3d Am. Compl. ¶ 75.  On July 5, 2007, the City sent Plaintiff a letter

17  claiming to have overpaid Plaintiff for his sick leave and demanding payment of $10,000.  3d Am.

18  Compl. ¶ 76.  The City later refused to permit Plaintiff to buy back his accrued compensatory time

19  off.  3d Am. Compl. ¶ 77.

20       On July 18, 2007, Plaintiff filed a petition for writ of mandate in the Alameda County

21  Superior Court, asserting that the City Defendants placed Plaintiff on unpaid leave indefinitely

22  without any due process and in violation of his constitutional right to due process.  See Defs.'s

23  Request for Judicial Notice ("Defs.'s RJN") Ex. A; 3d Am. Compl. ¶ 78.  The City filed its

24  opposition on December 6, 2007.  See id. Ex. B.  The state court held a hearing on December 18,

25  2007.  See id. Ex. C.  On February 25, 2008, the Superior Court denied the petition, finding that

26  Plaintiff had been provided with appropriate process given the circumstances.  See id.; 3d Am.

27  Compl. ¶ 79.  On April 24, 2008, Plaintiff filed a Notice of Appeal of the Order denying the writ.

28  See Defs.'s RJN Ex. D; 3d Am. Compl. ¶ 80.  That appeal is still pending.

On June 18, 2008, Plaintiff, proceeding <u>pro se</u>, filed this complaint in Alameda County Superior Court.  On September 18, 2008, the City Defendants removed this action.  Plaintiff retained counsel and filed an amended complaint on January 6, 2009.  Plaintiff alleges claims for violation of 42 U.S.C. § 1983, the Rehabilitation Act of 1973 (29 U.S.C. § 794), and the California Fair Employment and Housing Act ("FEHA")  (California Government Code §§ 12940, <u>et seq</u>.), as well as state law tort claims for intentional infliction of emotional distress and defamation.

On March 16, 2009, Plaintiff filed a complaint with the Department of Fair Employment and Housing challenging the City's July 3, 2007 decision to put Plaintiff on sick leave.  3d Am. Compl. ¶ 81.  On April 2, 2009, Plaintiff filed another complaint with the Department of Fair Employment and Housing challenging the City's demand that Plaintiff complete a fitness for duty examination in November 2006.  3d Am. Compl. ¶ 82.  Plaintiff received right to sue notices on both complaints.  3d Am. Compl. ¶ 83.

**Discussion**

**1.      City Defendants' Motion to Dismiss**

Under certain circumstances, a federal court may decline to proceed with federal litigation in deference to state court proceedings.  The Supreme Court has enunciated a number of factors for courts to use to determine whether to stay or dismiss federal proceedings where there is a pending state action: (1) whether either court has assumed jurisdiction over a <u>res</u>; (2) the relative convenience of the forums; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; and (6) whether the state proceeding is adequate to protect the parties' rights.  <u>See</u> <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 818 (1976); <u>Moses Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 25-26 (1983).  The Ninth Circuit added two considerations: (1) whether a parallel state proceeding is pending; and (2) whether the second suit is an attempt to forum shop or avoid adverse rulings by the state court.  <u>Nakash v. Marciano</u>, 882 F.2d 1411, 1416-17 (9th Cir. 1989).  The <u>Colorado River</u> doctrine should only be applied in exceptional circumstances, and its factors

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  should be applied flexibly.[1]  <u>See</u> <u>Moses Cone Memorial Hosp.</u>, 460 U.S. at 19; <u>Colorado River</u>, 424

2  U.S. at 818; <u>Nakash</u>, 882 F.2d at 1415 (citing <u>American Int'l Underwriters (Phillipines), Inc. v.</u>

3  <u>Continental Ins. Co.</u>, 843 F.2d 1253, 1257 (9th Cir. 1988)).

4       A district court invoking <u>Colorado River</u> may dismiss or stay the case.  <u>See</u> <u>Moses Cone</u>

5  <u>Memorial Hosp.</u>, 460 U.S. at 28.  However, a stay is generally the better option.  <u>See</u> <u>Arizona v. San</u>

6  <u>Carlos Apache Tribe</u>, 463 U.S. 545, 570 n. 21 (1983) ("[R]esort to the federal forum should remain

7  available if warranted."); <u>Attwood v. Mendocino Coast Dist. Hosp.</u>, 886 F.2d 241, 243 (9th Cir.

8  1989) ("We hold that the district court should have stayed rather than dismissed Attwood's action.

9  This holding ensures that the federal forum will remain open if 'for some unexpected reason the

10  state forum does turn out to be inadequate.'  The Supreme Court has strongly hinted that invocation

11  of <u>Colorado River</u> is contingent on keeping the federal forum open if necessary.") (internal citation

12  omitted).

13       Here, there is no <u>res</u> in this case so the first <u>Colorado River</u> factor is inapplicable.  The

14  second factor is neutral because the forums are equally convenient.

15       Some factors weigh against invoking <u>Colorado River</u>.  In discussing the fifth factor regarding

16  whether state or federal law controls, the Ninth Circuit stated that: "While the presence of state law

17  issues will rarely be sufficient alone to warrant abstention, 'the presence of federal-law issues must

18  always be a major consideration weighing against surrender [of jurisdiction],'" although concurrent

19  jurisdiction of the state court over federal claims reduces the significance of this factor.  <u>Nakash</u>, 882

20  F.2d at 1416.  Because there are federal claims in this case, this factor weighs against application of

21  the <u>Colorado River</u> doctrine.

22       The second factor from <u>Nakash</u> regarding forum shopping weighs slightly against invoking

23  <u>Colorado River</u>.  Plaintiff filed this action in state court which has concurrent jurisdiction, but

24  Defendants removed it, selecting the federal forum.  However, Plaintiff chose to file his second suit

25  only after losing the first, instead of filing all of his claims together in one suit.

26       More factors, however, weigh in favor of invoking the <u>Colorado River</u> doctrine.

27  _____

28       [1]     The Supreme Court has rejected calling this an abstention doctrine.  <u>See</u> <u>Cone</u>, 460 U.S.
at 14-15; <u>Colorado River</u>, 424 U.S. at 817; <u>Nakash</u>, 882 F.2d at 1415 n. 5 (9th Cir.1989) ("the Supreme
Court has flatly rejected this [abstention] categorization").

6

**United States District Court**
For the Northern District of California

1   Specifically, the fourth Colorado River factor and the first Nakash factor weigh somewhat in favor

2   of invoking Colorado River. The state court matter was filed first, more than one year ago, and the

3   superior court has denied the writ. The state appellate court is now considering that case and may

4   decide it before this case proceeds much further in this Court. Cf. Moses Cone Memorial Hosp., 460

5   U.S. at 21 (stating that the order of litigation factor weighed against a stay where the state court

6   action was filed nineteen days before the federal suit and the event that precipitated the federal

7   action did not occur until less than one day before the state court suit was filed, so the federal action

8   could not have been filed first). Further, both disputes involve Plaintiff's employment. See Nakash,

9   882 F.2d at 1416 (stating that exact parallelism between the state and federal actions is not required:

10  "It is enough if the two proceedings are 'substantially similar.'").

11      The sixth Colorado River factor, the adequacy of the state court proceeding to protect

12  Plaintiff's rights, weighs in favor of invoking Colorado River. Should the state appellate court

13  reverse the trial court's denial of Plaintiff's writ, Plaintiff's remedies in state court could include

14  actual damages, penalties, injunctive relief and attorney's fees (see Cal. Gov't Code § 3309.5), all of

15  which Plaintiff seeks in this federal litigation.

16      Further, permitting this federal lawsuit to go forward would result in piecemeal litigation, so

17  the third Colorado River factor weighs in favor of invoking the Colorado River doctrine. Because

18  the state court proceeding has progressed to the appellate level and may largely or entirely resolve

19  Plaintiff's claims, allowing this case to proceed in federal court would be inefficient.

20      In connection with the factors discussed above, especially the avoidance of piecemeal

21  litigation, Defendants argue that the Court should dismiss or stay this action under Colorado River

22  for the additional reason that if the appellate court affirms the trial court's decision on the writ, res

23  judicata would bar Plaintiff's federal claims, which they contend are based on the same primary

24  right as the state court litigation. See Takahashi v. Board of Trustees of Livingston Union Sch.

25  Dist., 783 F.2d 848 (9th Cir. 1986) (applying res judicata to bar federal claim involving same

26  primary right as in state court action); see also Clark v. Yosemite Community College Dist., 785

27  F.2d 781, 784, 786-87 (9th Cir. 1986) (stating that even though "Clark did not include a Section

28  1983 claim in [his writ petition], the doctrine of res judicata applies not only to those claims actually

United States District Court
For the Northern District of California

1  litigated in the first action but also to those claims which might have been litigated as part of that

2  cause of action."). A primary right is defined as "the right to be free from the particular unlawful

3  conduct." Sawyer v. First City Financial Corp., 124 Cal.App.3d 390, 399-400 (1981). In

4  determining the primary right, "the significant factor is the harm suffered." Argarwal v. Johnson, 25

5  Cal.3d 932, 955 (1979). It is well-settled that a mandamus action may preclude further litigation.

6  Federation of Hillside & Canyon Associations v. City of Los Angeles, 126 Cal.App.4th 1180, 1205

7  (2004) ("Mata [v. City of Los Angeles, 20 Cal.App.4th 141, 149 (1993]] made no attempt to explain,

8  and Petitioners do not explain, why a decision in a prior mandamus proceeding should not be res

9  judicata if the requirements for the doctrine are satisfied."); see also Manufactured Home

10 Communities, Inc. v. City of San Jose, 420 F.3d 1022, 1031 n. 12 (9th Cir. 2005) ("Moreover, it is

11 well-settled by the California Supreme Court that 'the doctrine of res judicata applies to judgments

12 on the merits in proceedings in mandamus.' MHC's argument misrepresents California law on this

13 matter. A mandamus action may, and in this case does, preclude further litigation.") (internal

14 citation omitted).

15      Plaintiff argues that the primary right to be vindicated in the writ petition was the right to a

16 due process hearing for which remedies include back pay, penalties and damages pursuant to

17 California Government Code §§ 3300, et seq. He argues that the primary rights to be vindicated in

18 this case are the right to free speech, the right to be free of retaliation, the right to be free from

19 overly intrusive medical examinations and the right to continue working at a desk job as a

20 reasonable accommodation for which Plaintiff seeks monetary damages, reinstatement, injunctive

21 relief and a due process hearing. City Defendants counter that the primary right Plaintiff seeks to

22 remedy in both cases is his continued employment with the City as a police officer.

23      The question of whether the same primary rights are involved in Plaintiff's state and federal

24 cases is somewhat complicated. This case most resembles Takahashi. There, the plaintiff was a

25 high school teacher who was found to be incompetent to teach by the Commission on Professional

26 Competence and was subsequently terminated. The plaintiff began a mandamus proceeding in state

27 court to compel the Commission to set aside its decision, which was unsuccessful, as were her direct

28 appeals in state court. The plaintiff then filed an action in federal court alleging that the school

**United States District Court**
For the Northern District of California

1   district had violated her Fourteenth Amendment rights and 42 U.S.C. §§ 1981 and 1983 by

2   terminating her and employing job performance evaluation methods that were different than those

3   used to evaluate similarly situated employees.  In affirming the district court's grant of summary

4   judgment for the defendant based on res judicata, the Ninth Circuit determined that the federal

5   action was based on the violation of the same primary right as the state court action, that is, the

6   contractual right to employment.  In focusing on the harm suffered, the court stated:

> Absent termination of her employment contract, Takahashi suffered no harm.
> Takahashi's allegations of mental distress caused as a result of her dismissal do not
> present a separate injury.  Rather, any such distress would be a consequence of the
> District's violation a Takahashi's primary contractual right. Consequential damages
> cannot support a separate cause of action.
>                                         * * *
> While stating the primary right asserted in her first action in constitutional terms,
> Takahashi has failed to alleged a new injury. "Even where there are multiple legal
> theories upon which recovery might be predicated, one injury gives rise to only one
> claim of relief." By invoking the Constitution and § 1983, Takahashi has merely
> presented a new legal theory upon which she seeks recovery.

13  Takahashi, 783 F.2d at 851 (internal citations omitted).  The Takahashi court noted that the

14  plaintiff's emotional distress claim did not raise harm independent of the termination:

> We do not read Takahashi's complaint as alleging any mental distress caused by the
> District's evaluation of her performance independent of that caused by the District's
> termination of her employment.

17  Takahashi, 783 F.2d at 851, n.3; see also Balasubramanian v. San Diego Community College Dist.,

18  80 Cal.App.4th 977, 991-92 (2000) ("The determinative factor in applying the primary right theory

19  was the harm Balasubramanian suffered.  In both the federal and state actions, the harm she alleged

20  was having been rejected for the position of assistant professor.  Although her theory in federal court

21  was discrimination and her theory in state court was breach of contract, both actions involved the

22  primary right to be employed by District.").

23        Similarly, here, Plaintiff's state and federal cases appear to involve the same primary right

24  against the City Defendants, even though Plaintiff seeks slightly different though largely

25  overlapping remedies.  Plaintiff seeks to address the same harm in both cases, that is, his right to

26  employment. Also, as in Takahashi, Plaintiff's complaint does not appear to allege any emotional

27  distress against the City Defendants independent of the distress they caused by placing him on

28

1    indefinite leave without pay.[2]

2        The cases cited by Plaintiff are inapposite.  See Grisham v. Phillip Morris, 40 Cal.4th 623

3    (2007); Agarwal v. Johnson,  25 Cal.3d 932 (1979).  In Grisham, unlike in this case, the plaintiffs

4    brought one legal action each against the defendant tobacco manufacturer in federal court, rather

5    than a second suit in federal court after litigating in state court.  Further, the Grisham plaintiff

6    alleged two different injuries, one physical and one economic, that manifested themselves at two

7    different points in time, but arose from the same addiction to nicotine.  Here, the injuries alleged by

8    Plaintiff in his state and federal cases arose at the same time.  Further, the issue the Grisham court

9    decided was whether the plaintiff's claims were time-barred, not whether the primary rights doctrine

10   applied.  The Grisham court did note that the primary rights issue and the statute of limitations  issue

11   intersect "when a single wrongdoing gives rise to two or more different injuries, manifesting at

12   different times, raising the question whether the two injuries are invasions of two different primary

13   rights."  Grisham, 40 Cal.4th at 642.  However, the court expressly declined to resolve the

14   application of the primary rights theory and did not rely on the theory in its decision:

15           We need not resolve whether and under what circumstances two different physical
             injuries arising out of the same wrongdoing can give rise to two separate lawsuits, or
16           whether the two injuries in the present case can be conceived of as invading two
             different primary rights. Here, what is alleged are two different types of injury, one
17           serious physical injury or injuries, the other an economic injury, giving rise to two
             different types of action.

18   Grisham, 40 Cal.4th at 643.

19       In Agarwal, the plaintiff filed an action in state court alleging emotional distress, intentional

20   infliction of emotional distress and interference with business relationships arising from the

21   termination of his employment and statements made by his former employer to prospective

22   employers.  The plaintiff also filed an employment discrimination action in federal court based on

23   Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq.).  Before the state court reached

24   a final judgment, the federal court determined that the plaintiff had not proven discrimination.

25   Using a primary rights analysis, the state Supreme Court determined that res judicata did not bar the

26

27   _____

28       [2]   While Plaintiff's claim against Defendant Raffle does allege independent mental distress
     from the fitness for duty examination, that claim is dismissed based on the common interest privilege
     as set forth below.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   plaintiff's state court action.  The court reasoned that the federal court action was directed at the

2   defendant's employment practices, while the harm in the state court action, although arising in

3   conjunction with the federal claims, was distinct from employment discrimination.  A subsequent

4   California case, Balasubramanian, has distinguished Agarwal on the basis that the state court action

5   also involved post-termination conduct by the employer, which was harm distinct from the

6   termination at issue in the federal case.  See Balasubramanian, 80 Cal.App.4th at 992.  Here, as

7   described above, it appears that Plaintiff's claims against the City Defendants in both cases resulted

8   from the City's employment practices.  Furthermore, the Ninth Circuit's decision in Takahashi is

9   more directly on point.

10        The primary rights in Plaintiff's state and federal court actions appear to be the same.

11  However, because the state court case remains pending, the Court need not make a final

12  determination of the primary rights issue at this stage.  The fact that the primary rights may be the

13  same weighs in favor of applying the Colorado River doctrine.

14        On balance, therefore, the circumstances of this case favor a stay.  Accordingly, the Court

15  need not reach the remaining bases for the City Defendants' Motion to Dismiss.

16  **2.      Defendant Raffle's Motion to Dismiss**

17        Defendant Raffle moves to dismiss the claims against him for intentional infliction of

18  emotional distress and defamation on the ground that Plaintiff has failed to state a claim.  He also

19  seeks to dismiss Plaintiff's prayer for punitive damages on the ground that it is barred because

20  Plaintiff failed to comply with California Code of Civil Procedure § 425.13(a).  Defendant Raffle

21  moves to dismiss all claims and relief against him on the additional ground of the qualified common

22  interest privilege contained in California Civil Code § 47(c).  Because Plaintiff's claims against Dr.

23  Raffle are barred by the common interest privilege, the Court need not reach the other issues raised

24  by the parties.

25        The common interest privilege applies:

26        In a communication, without malice, to a person interested therein, (1) by one who is
          also interested, or (2) by one who stands in such a relation to the person interested as
27        to afford a reasonable ground for supposing the motive for the communication to be
          innocent, or (3) who is requested by the person interested to give the information.

28

11

United States District Court
For the Northern District of California

1   Cal. Civ. Code § 47(c); Mamou v. Trendwest Resorts, Inc., 165 Cal.App.4th 686, 729 (2008)

2   (setting out two-step inquiry to determine application of privilege, that is, whether the occasion was

3   privileged and then whether the communication was made without malice).  Reports like the one

4   submitted by Dr. Raffle to the City are generally subject to a qualified privilege.  See Felton v.

5   Schaeffer, 229 Cal.App.3d 229, 238, n.7 (1991) ("The complaint on its face suggests appellants'

6   publication was protected by the qualified privilege under Civil Code section 47, subdivision (c),

7   because the complaint alleges the false statement about Felton (i.e., he was 'medically unsuited

8   [and] not employable [due to] Noncompliance With Antihypertensive Treatment') was contained in

9   a report from appellants to Grossmont. Such communications are as a general rule qualifiedly

10  privileged.").  "For purposes of a statutory qualified privilege, '[t]he malice referred to ... is actual

11  malice or malice in fact, that is, a state of mind arising from hatred or ill will, evidencing a

12  willingness to vex, annoy or injure another person. [Citation.] The factual issue is whether the

13  publication was so motivated. 'Thus the privilege is lost if the publication is motivated by hatred or

14  ill will toward plaintiff [citations], or by any cause other than the desire to protect the interest for the

15  protection of which the privilege is given' [citations].'"  Mamou, 165 Cal.App.4th at 729 (quoting

16  Agarwal v. Johnson, 25 Cal.3d 932, 944-945 (1979), repudiated on another point in White v.

17  Ultramar, Inc., 21 Cal.4th 563, 574, fn. 4 (1999)).

18         Plaintiff's theory in this case is that Dr. Raffle provided his report to the City in order to

19  benefit Dr. Raffle, that is, to further his relationship with the City.  See, e.g., 3d Am. Compl. ¶¶ 118-

20  119 (alleging that Dr. Raffle skewed his fitness for duty report to provide a reason for the City to fire

21  Plaintiff, conduct that was motivated by Dr. Raffle's desire to continue receiving work from the

22  City).  There are no allegations that Dr. Raffle was motivated by any negative feelings about

23  Plaintiff or that Dr. Raffle had a state of mind arising from ill will or hatred that caused him to reach

24  certain conclusions about Plaintiff.  Therefore, the common interest privilege applies.

25         Plaintiff argues that the allegations that Dr. Raffle deemed Plaintiff unfit for duty at the

26  request of Plaintiff's employers show reckless disregard for Plaintiff's rights, establishing that Dr.

27  Raffle acted with malice.  See Sanborn v. Chronicle Pub. Co., 18 Cal.3d 406, 413 (1976) ("The

28  malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing

1    that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the

2    defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in

3    reckless disregard of the plaintiff's rights.").  However, <u>Sanborn</u> interpreted an earlier version of

4    Civil Code § 47, and the more recent <u>Mamou</u> case does not cite <u>Sanborn</u>.  There is no recent

5    authority to support Plaintiff's argument that the allegations he has made regarding Dr. Raffle show

6    reckless disregard sufficient to satisfy the malice element of the common interest privilege.  Because

7    the common interest privilege protects Dr. Raffle's communication with the City regarding

8    Plaintiff's fitness for duty examination, Plaintiff's claims for intentional infliction of emotional

9    distress and defamation, as well as his prayer for punitive damages, fail.  Accordingly, Defendant

10   Raffle's Motion to Dismiss is granted without leave to amend.

11   **3.       Case Management Conference**

12          The September 22, 2009 Case Management Conference is vacated.  A Case Management

13   Conference is scheduled for November 17, 2009 at 10:00 a.m.  A joint Case Management

14   Conference statement shall be filed no later than November 10, 2009.  If the state court action has

15   not concluded by that date, the parties may seek a continuance of the Case Management Conference.

16   The deadline to exchange initial disclosures is also continued to November 17, 2009.  The parties

17   may file a stipulation and proposed order to continue the ADR Conference to a date commensurate

18   with the new date for the Case Management Conference.

19          **IT IS SO ORDERED.**

20    Dated:  August 20, 2009

*Elizabeth D. Laporte*

ELIZABETH D. LAPORTE
United States Magistrate Judge

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California